Next case is Dawson v. RockTenn Services. Good morning, Your Honors. May it please the Court, I'm Todd Benson here on behalf of Brad and Charlene Dawson. There's two issues that I would like to focus on today. The first being the relationship between lack of reasonable care and constructive knowledge under the Civil Code Article 2317.1, and the second is the race ipsa locator issues relating to the summary judgment, which are what the standard is, whether the plaintiffs only have to show that negligence is the most probable cause of the accident, and two, whether the control issue is even a factor anymore, and if so, whether the plaintiffs properly defeated summary judgment. There's submitted evidence that should have defeated the summary judgment on that matter. As this Court is aware, this is a summary judgment case, so the standard of review is de novo. In this case, Judge Hornsby granted RockTenn's motion for summary judgment, first focusing on the premises liability claim. He held, he used the magic words constructive notice, but as I'll discuss, he didn't, and I have a lot of respect for Judge Hornsby, but respectfully, he missed the issue on the lack of due care, but he held that RockTenn is entitled to summary judgment, and the quote from his opinion is, there is simply no evidence of any problems or warning signs prior to Dawson's accident, close quote. And I would assert to this stringent a standard for a plaintiff. Now, I would also note something that when I was reading this record, I wasn't counseled when the motions were filed and decided I was retained on this appeal, so I had to fresh look at this, but it was striking to me when I read RockTenn's motion for summary judgment and memorandum of support, it was like the notice issues were almost a throwaway argument. They spent, their memorandum of support is 19 pages long. They spend page after page after page on causation issues, and then they have nine sentences on notice that say, here's the standard, and they didn't prove we knew. There's no real discussion. There's no real talk. It's like they just threw it in there, and the district court said, well, he didn't take debate on the issue. He said, well, they didn't show that there were any problems beforehand. But the problem with that is, under Louisiana law, and to quote the Walters case, second circuit case, the periodic inspection of one's property for defective conditions is intertwined with the concept of constructive notice. And 2317.1 says you can prove liability by showing actual knowledge or by showing constructive notice. Okay, so what gave RockTenn a duty to inspect? 2317.1. So you're saying that implies a duty to inspect? Yes. And how do we know that an inspection would have revealed the problem? That is a question of fact, but I would say there's evidence in this record that shows it would have too, because there was an accident two weeks later. They did the inspection. I know that's kind of post facto evidence, but it's circumstantial evidence. But the Blue Marlin case, which is a Jones Act case, and being a landlubber from Shreveport, I don't have a lot of Jones Act experience, but you know, I was surprised when I read that case that the Jones Act scheme is almost identical to the 23, or is identical to the 2317.1 scheme, and it says you have to have actual notice or you have to not have exercised due care to be held liable. And in that case, the district court, the plaintiff brought a suit because there was a defective condition on a ship, and the district court said, well, they didn't do their inspection, okay, and so the defendants are not entitled to summary judgment, and it's a question of fact as to whether the inspections would or would not have shown the existence of the defect. What, I mean, tell me what, how that's a question of fact. Well, it's, it's a, it's a, well, first of all, I would note that Rock 10 didn't raise this issue on their motion for summary judgment. So, in a way, it's premature. They didn't, they didn't point out that, as they required under Rule 56, that, hey, the plaintiffs can't show that there's not, have revealed the defect, okay. So, this is all sort of an ex, after the fact when Judge Hornsby ruled on the, on the basis of actual knowledge, and he used the word constructive knowledge, but he didn't. But you've got your, okay, I'm sorry, go ahead. Well, what I'm saying is, it's, it's, it's a strange deal here. For them to get summary judgment, they had to come forward with some evidence that no, if they had inspected, they wouldn't have found anything. Either that, or they had to, they had to raise the issue specifically in their motion and say, plaintiffs, you got the burden on this, and we point to the absence of evidence in the record, where's your evidence? And, and, and they, and nobody saw this coming. If you reverse and send it back, and now you're at trial, what evidence are you going to put on, on the point that failing, that had they inspected, they would have found? I'm not even sure I have to, Your Honor. If you look at the, at the Walters case, and you look at the Crooks case, and you look at the, you look at the cases I cited in my break, the Matthews case. In the Matthews case, Judge Hicks gave summary judgment to the plaintiff. And, and he said, look, you had a duty to inspect these chairs, you didn't. The statute says you have constructive notice, and it's reasonable to infer that you would have found it. They didn't, there's no, it's one of the, it's an inference, Your Honor. In the, in the, in the, based on the facts. Well, I guess the facts are a little bit interesting, because were there offloading in between the two weeks that they? Yes. So, it's kind of interesting, like, what caused it? If there was obstruction, why did it only obstruct? This is, this is my common sense talking here. I don't know that there's any evidence in the record, because this didn't really, this issue didn't get launched into it. But it seems to me, that that's not unusual. If you have a, for instance, a strange shape of obstruction, and it can flow around it, and then it gets turned a certain way, and it stops it, and then the pressure goes off, and it, you know, a piece of ice in your straw when you're drinking a Coke, you know, sometimes it'll stop you up. Sometimes, it depends on how it's turned, the shape, the pressure in there. But certainly, we know that happened, because we had this accident, and then two weeks later, with deliveries in between, we had another, and even Rock that this obstruction caused the accident issue in this case. So, we know that happened. We know there was an obstruction in both cases with, with deliveries in the middle, where, and, and, and, and bleed-offs in the middle, where it, it didn't stop, stop the line to the extent where it caused the acid to blow back. Um, so, you know, the Matthews case is, is, is exactly what we have here. The court said, look, you have an obligate, and... Do we have evidence that obstructions like this do, like, are common, that they tend to build up over time? I mean, I'm looking for something that would tell me, if I'm Rock 10, that I need to be inspecting for this. I think that's the point of the diligence. I mean, we can always look back and go, something could happen, because it did. But that's a backwards look. Looking forward, the question is, what do I know about this kind of line, and what happens to it? And so, how would I, as Rock 10, know that this kind of obstruction could build up over time, so that I would be inspecting for it, or regularly replacing the line, or whatever it is they needed to do? I would answer that, Your Honor. Again, going back to the Matthews case, that what inspection you have to do has to be reasonable under the circumstances. This is an acid offload system, a very dangerous process, a very dangerous material. Did some experts say that, yes, you should inspect, and you should inspect every six months, two years, three years? I mean, what's the evidence on how often these should be inspected? You know, I don't know. I think, you know, Mr. I'm drawing a blank here, but the Dawson's expert said you should inspect. And I would point out to Your Honors. What are you inspecting for? You're making sure the lines aren't clogged. Lines get clogged. I mean, it's an acid offload. You're inspecting for an obstruction in the line. Or blow the lines out. Maintenance. It can be maintenance, too. You know, blow the line. In fact, if you look, if you look, one of the things, if you look in the, in the, in Rockton's record excerpts, they talk about what their duties are, okay? And it doesn't talk about this offload line, but one of their duties says, you know, to make sure the lines are all clear to the, from the car to the acid offload system. Now, this is a different line. But everybody. A while ago, you said somebody admitted something about you must inspect. Who said what? Your Honor, I'm drawing a blank on our expert's name. Let me look in my book. Rockton's expert said an obstruction caused the accident. Yes. Yes, that is right. Mr. Walensky, Walensky, Rockton's expert, said more probably than not, it was his opinion that an obstruction, the obstruction in the line that caused the accident two weeks later was the cause of this accident. What was the obstruction? We don't know, Your Honor, because when Rockton finally went and looked at this line after the second accident, they didn't look at it after the first accident. But when they looked at it after the second accident, they discarded the line. But we know that part. But what did they say about, well, we should have inspected or it should be inspected? You said something and I didn't get it all. Dawson's expert said that. Yes, Dawson's expert said that in his report, Your Honor. And I believe he said that. I'll need to look. If I'm wrong with that, I'll... Isn't that kind of important, though, because the reasonable care that we're talking about is that by exercising reasonable care, you would have discovered. Right. If exercising reasonable care, you wouldn't have discovered, then it's irrelevant. It's just irrelevant. You're right. So I'm trying, what we're all trying to figure out is what evidence do we have that regular maintenance, regular inspections, regular whatever was, A, required and B, would have accomplished something that would have prevented the accident? I would point out two things, Your Honor. One, given that it's an asset offload system and given that the standard is, given the... We're not experts. That's the problem. We're just not. Right. Right. But, Your Honor, it's a reasonable standard. It's a reasonable standard. And Matthews discusses the standard. And it says, you know, given... I don't know. It may be more risky to have somebody put the hose up and look at it visibly than it is. I just don't know what the answer is. There are lots of things that could be... Maintain, you know, it doesn't have to be... I just don't want to take your word for it as an argument. I understand. A lawyer to a judge. Just what's the evidence? Well, Your Honor, the problem we have is this issue wasn't raised on the summary judgment. The reasonable care issue wasn't raised by Rock 10, okay? And so we're down the road. The judge said, well, there's no actual notice. Weren't you fairly close to trial? Yes. Okay. And so didn't you have the evidence? I mean, didn't your client have the evidence that they're going to present at this point? We have the expert testimony, Your Honor. Okay. And so don't you know what's in it? I mean, that's my point. I understand that maybe the materials in the district court may not be as fulsome as we'd like them to be. But now we're asking you, what's the evidence when you're a couple of months from trial? I don't remember the timing, but close to trial. What do the experts say on a fairly key issue? I would say that, Your Honor, that it's not necessarily requiring of expert testimony. You know, I think, you know, an inference can be drawn if you have a dangerous system, you never look at it, and you never maintain it at all. And the line becomes clogged. And there is evidence in the record there was construction in the area that was causing dust and debris in the air. And that's in the record. And if they had, they knew that, ROTCAM knew that, and especially under those circumstances, given the fact that the dangerous procedure that we have here, the dangerous process of offloading this acid, then they had a duty to inspect, and it's a clog in the line. It's not like it's pressure that comes and goes. Why wouldn't it have to be cleaning up the clog? Self-cleaning line. Well, I mean, acid may, it's sulfuric acid. It may not eat through rock or debris. I don't know that. That's my point. But we don't know it would either, Your Honor. You've got the burden. I understand, but I have the burden at trial, and on this motion, that issue really wasn't raised. And, Your Honor, it's reasonable to, like I said, this isn't like the Yacuti case where there's pressure, okay? Pressure can come, pressure can go. There's an object in this clog in the line, and it's there, and it's conceded by their expert that there's a physical thing clogging the line, okay? Now, if there's a physical thing in a line, an inspection would find it or maintenance would blow it out of there. All you have to do is blow through the line and see if you're getting the same air pressure on the other end. If not, you have something in the line that you need to remove or replace the line periodically. So the fact that this accident occurred is all that it takes to establish liability? No, ma'am. No, ma'am. And that's what they try to say in their report, that I'm, that the plaintiffs are trying to bring back the old strict liability. And that's not at all our position, because under the old strict liability, if you had a thing in your guard, and it was defective, regardless of how much new care you exercised, you were liable. And the legislature didn't think that was right. And so in 1996, they changed 2317.1 to a new paradigm. And what they said was, you can, plaintiffs, you can prove fault by showing actual notice, or you can prove it by showing, by showing a failure to exercise due care, which was a compromise. So in other words, the legislature said, if you're a defendant, and you have guard over a thing, and you exercise due care, and it's defective, we're not going to find you to be liable. But if you're a defendant, you can't put your, or you own a thing, you can't put your head in the sand. Who says due care requires inspection a certain way periodically? Well, that's what the Dawson case says. No, no, about this line. I mean, the Matthews case? About this line. About this line? Who, who, somebody who knows about these lines said, you must inspect this, in this way, and this often. I'm not sure that's exactly in the record, Your Honor, and I'll, I'll check. I'm not sure there's exact evidence that you have to inspect this way. Well, well, I mean, yes, yes, yes. Dawson's expert, and I'm sorry that I'm drawing a blank on his name, and if you let me look, I'll, I'll, I'll say it. Mr., Dr. Hoffman. Sorry, I was drawing a blank there. Dr. Hoffman says, you know, you had to, you know, that the, that the design, that the design of the system and the method of depressurizing were, made it dangerous, Your Honor, and, and you needed a way to determine if the, if the vent lines had pressure. Now, and I would say to Your Honor. You're talking about the gauge, that it would have been $300 to put a gauge on. Well, that, that too, but, but Your Honor, I would say to you that, like in Matthews, I don't, I mean, I don't think, there was no expert testimony. In Cook's, in any of those cases where they said, well, you have an obligation to, to do this, this way, this often, it says you have to look at the factors of what would a reasonable person do, given the gravity of the situation. Okay, your, your time's expired. Oh, thank you, Your Honor. Thank you. May it please the Court, John Vietor on behalf of Rock 10. To answer the questions, there's not a single expert statement in the record, or anyone's testimony in the record, that says the line must be inspected on a yearly, twice a year, six months basis, and that's how you're going to determine whether the clog would not exist. Where's your summary judgment argument that we did not have an obligation to inspect, and why? Well, the argument is under 2315, I mean 2317.1, which requires either actual or had no actual knowledge of any problems. The line's been used for, for years, twice a day, sometimes, but every day, at least, without any prior incident. But part of that is that there's no constructive knowledge, and the definition of constructive knowledge. Okay, I'm sorry, go ahead. I'm sorry, the definition of constructive knowledge contained in 2317.1 says that you either knew or you, with the exercise of reasonable care, should have known. Where's your, where's your, your affirmative evidence that our failure to inspect was exercising reasonable, reasonable care? Well, and Your Honor, I believe that's, that's the point of difference between us and the appellant, is that it's their burden to show that we did, we violated 2317.1. Where did you specifically point out that they, in your moving papers, they need to come forward with evidence that we had an obligation to inspect this line, and they didn't do it? What we said is they have to show that exercise of reasonable care should have discovered the defect, and that's the whole point that, that was asked. What evidence is there that exercise of reasonable care should have discovered the defect? I believe it was testified, or argued earlier, that they didn't even have that burden, and the example given was, I think, a perfect example for this case, but a clogged straw with ice. Just because there's a temporary hazard, which may occur over time, doesn't make it a defect under 2317.1, which is the Dozot case. There is no evidence, and I'd like to point out the testimony that's repeated throughout the... But does it seem reasonable that you could just have a line that Sulfuric Acid is going through, and you never have to replace it, you never have to inspect it, it just can sit there until it blows up in someone's face, and then you'll replace it, maybe the second time, I guess. Second time it blows up in someone's face, you'll inspect it, and that's the standard of care. That's not the standard of care, Your Honor, and the point is, though, it is not an active duty to discover any possible defects or problems that may exist on your property. We have individuals that use this on a daily basis, and it's their duty, the instructions, which are in the record, on Excerpt 768, provided the driver is supposed to inspect the hoses, including the bleeder line. Two weeks later, there was an obstruction. There was an obstruction. Your people say there was an obstruction. I agree with one qualification. There's, throughout the brief, there's the statement that our expert, Walensky, and I'm probably mispronouncing his name, testified that, more probable than not, the clog was the cause of the first accident, Mr. Dawson's, and that is absolutely untrue. The testimony is clear. At Record Excerpt 1872, the question he was asked was, if Mr. Natten's opinion, which is the fact witness for Martin, after his investigation was that the vent pipe was clogged, causing both incidents, would you disagree with that? The answer was, I would accept that as a possibility. The next question was, okay, would you accept it as a probability? And the answer was yes. That is a probability. A probability is between 0 and 100. It can be 1. It can be 50. But it has to be more likely than not to satisfy the burden. And that's not the question that was asked. That's not the testimony that was solicited from our expert. He just merely said it's a possibility, and I would agree that it could be a probability. And I think it's also interesting to look at the only evidence in the record regarding— My point is that shows that there can be a clog in there that can cause an accident just like this. And what did your people say about, well, we didn't know about the clog. We had no reason to know about the clog. Inspecting would not reveal the clog. What's the evidence about what you do to keep a clog from occurring? Well, this has never occurred. And we've not discovered anywhere on any other of the other industry members, such as ourselves, who've complained of having a clog in the vent line. This is the first time, Mr. Dawson, it's the first time that we're aware that it's occurred. And there's been no evidence that that's occurred anywhere else or that anyone else had any sort of inspection procedures. Any evidence about what the industry standard is on do you inspect these lines? Yes, no, if so, how often, what do you inspect for? There is no evidence in the record regarding inspection of lines. But there is also no evidence on what the industry standard— it's their burden to show that we failed to meet the industry standard. But do you need to point that out so that they then know they need to meet that burden in the response to the summary judgment? Well, I think, Your Honor, the argument that there's no constructive knowledge, that is the argument that upon reasonable—with the exercise of reasonable care, you should—there's no evidence that we should have discovered. They have to come forward with that burden of proof to satisfy that essential element of their claim. This is—like, I think it was— They're saying there's a general duty to inspect wear items. And so the fact that y'all didn't inspect at all means we don't need to worry about every year or every five years or every six months because you didn't inspect at all, and therefore, you didn't exercise reasonable care. And I think that's an important distinction, the wear items. The only evidence we have in the record, which is also from our expert at Record Site 1872, about how a clog like that could occur, if you know. That was a specific question to him. His answer was, you could have debris in the line or in the piping. And then the question was, okay, and where would that debris come from? The material that was being conveyed could contain debris. What about their argument about the pressure gauge, that it cost $300 to put a pressure gauge? If it was clogged, you could tell from that pressure gauge? You could also tell from the pressure gauge on the back of the tanker car,  but that was another factual issue that the tanker, in this case, after Martin inspected it, in addition to finding the broken glass in the bottom of the tank car and the faulty spring, which at the time of the original inspection, Martin's own folks concluded that that was the cause of the gas buildup in the line. They also replaced the PSI gauge on the back of the tanker because you probably couldn't see it or you couldn't tell if it was working correctly. That's the testimony in the record from Mr. Williams, with Martin, who inspected the tanker car. Are you saying there were two different clogs in the two weeks? In other words, there was clog number one that injured Dawson, and then two weeks later there was clog number two that injured the second worker and they were separate clogs? I'm not even acknowledging that there was a clog in the first one. What I'm saying is, even if we assume there was a clog, there's no indication that it existed that morning. There's no indication when we had offloaded tanks. There's no indication it existed the next day. Are you saying even if there was a duty of care to every six months inspect it or every year replace it, there's no showing that would have mattered? And that's required under 2317. It's not just a duty of care, it is that the exercise of reasonable care should have known of the ruin, vice, or defect, and the damage could have been prevented by the exercise of reasonable care. So what that takes is, that takes testimony by someone that an inspection would have discovered this clog and that an inspection at a certain time that was reasonable would have prevented the accident. So what if we inspected it that day and the morning it wasn't clogged, but it was clogged in the afternoon? I mean, there's no evidence as to how this clog occurred. If it occurred, other than the fact that our expert testified that one cause of a potential clog could be debris from the material, that was being offloaded on that instance. So there's nothing in the record to say this particular type of clog existed for months before or by the evidence we saw, we could tell existed for a time period before. And just to distinguish the cases, because there was a question about whether or not the normal wear and tear or wear and tear item, if there's a duty to discover that, as it relates to the Powell case that's cited by plaintiffs, I believe it is distinguishable because it was an instance where it was a wear and tear of an item. They found that the reducer would fail as it wore, as it wore out. And so they said, because it's a wear and tear item, that you do have a duty to inspect and you didn't. And so in that instance, it was because it was a wear and tear item. There's been no indication that the clog here had anything to do with wear and tear of our equipment. Back to your discussion about the valve. Why shouldn't you have a sort of a failsafe valve on your end in case a truck comes in with a defaulty valve? Why shouldn't there be a valve on your client's line as well? And, Your Honor, there could be. You could figure out a way to make sure that nothing ever goes wrong. If you could, then you could add, keep adding levels of safety. My point is, there was no indication. Do you require your people to certify that their gauge is working before you allow them to hook their truck up? We require that it's the driver's responsibility to maintain their own equipment. At, um, that includes the pressure gauge on the back of, but, Is that what it says? You're responsible for determining the pressure in the line. Your gauge better be working or acid can blow in your face. Correct. And not only, not only, What is the point of that specific thing? Specifically, at 768 of the record, the driver's responsibilities, and this is our written loading and hand unloading procedure. It says all hoses must be free from defects and void of other materials before hookup. That's the driver's responsibility. The driver is transporting these chemicals. They're the one who has complete control over this offloading process. They're the ones who hook up all the hoses. We don't do it. Well, let's suppose it wasn't a clog in their line. It's a clog in your line. And because their gauge was broken, they didn't know it. And they can't look at the pressure gauge on your line because there isn't one. If it's a clog in whose line? In our line? No. In their line. Your line. Not in their line. They did exactly what you said. Their hoses didn't have a clog. It was a clog in your hose. And they couldn't, they couldn't use their pressure gauge to measure because their pressure gauge was broken. And they couldn't use yours because you didn't have one. And the requirement is that all hoses. I mean, they're supposed to check their procedures. They're supposed to check the hoses that they utilize. Their hoses are fine. It's just their gauge is broken. And I'm sorry. The question was whether or not we would have a duty. Why isn't there a duty for you to affirmatively have a gauge on your end because you can anticipate that sometimes a truck gauge might be broken? I'm just asking. And I think that's the whole point is we don't have to anticipate all possible accidents that may occur. I mean, there was no indication prior to this that there was any issues that may have occurred. And with regards to the duty of discovery under Louisiana law, and this is from the McGuire case, it requires that precautions be taken against occurrences that can and should be foreseen. But it doesn't require that one anticipate unusual, improbable, though entirely possible happenings. We don't have to anticipate all the possible happenings. The question is whether or not reasonable care would have discovered the defect and would have prevented the accident. And there's just simply no evidence of that. And it wasn't addressed, but I'm sure it will be addressed in rebuttal. The application of Louisiana's res ipsa loquitur rule is completely inapplicable to this situation. Res ipsa is the scenario where literally the thing speaks for itself is what it stands for in Latin. And Louisiana law tells us that this is the exception to the general rule that negligence is not presumed, that it must be sparingly applied. The doctrine of res ipsa involves a simple matter where a plaintiff using circumstantial evidence to meet his burden of proof by preponderance of evidence and merely assist the plaintiff in presenting a prima facie case of negligence when direct evidence is not available. But it's an evidentiary burden. It creates a rebuttable presumption of negligence, but it doesn't get rid of the knowledge requirement on 2317.1. And there's several reasons why res ipsa should not apply. There's not a case that they can cite where res ipsa applied where there's multiple probable causes of the accident. They rely on Walensky's testimony that I went through, that it's the only probable cause, but that's not the case. The first prong of res ipsa requires that the injury is the kind which ordinarily does not occur in the absence of negligence. That has been defined by the jurisprudence as only when circumstances surrounding the accident are so unusual as to give rise to an inference of negligence. I believe we heard an example from the podium as how you could have a temporary clog, which it could happen without anyone's negligence. It could be in the material that's being offloaded. That doesn't mean there's negligence. I don't believe res ipsa should apply to this scenario. The one case where they said was a clear finding of where res ipsa applied was in the Lawson case where when someone deployed their horn, the airbag deployed. And they said, absent unusual circumstances, negligence is usually the cause of that. But then went further to find res ipsa didn't apply because they couldn't determine whether or not they kept control of the prior owner could have changed the setup of the airbag, is what the Court concluded. But the second prong of res ipsa also doesn't apply, and it's that the evidence must sufficiently eliminate other, more probable causes such as the conduct of the plaintiff and the third parties. In this case, again, the mischaracterization of Walensky's testimony, he does not say it's the most probable cause or more probable than not. And the evidence identifies several probable causes, which there's questions about whether or not they were the actual cause. But for purposes of res, I mean, for res ipsa, I think they're appropriate to say that reasonable minds could conclude that the second prong is not satisfied. And those different probable causes are, first off, reasonable minds could conclude that the line became clogged by debris that was not there due to negligence. It was simply the result of a fortuitous incident where there's something in the chemicals that's being offloaded, and it becomes clogged in the line. The second probable cause is the Court, in this instance, concluded that there was evidence from which reasonable persons could find that there was a miscommunication between the plaintiff and Mr. Brown, who was a trainee on the job for the first day. There was some discussion about the appropriate hand signals for when you open the valve, and Mr. Dawson testified that he waited 30 seconds before he tried to open the valve, and Mr. Brown said that upon opening the bleeder valve, he heard Mr. Dawson yelling within five to six seconds, which is inconsistent. In addition to that, there's the initial report by Martin. And understand, when they were deposed, they changed their testimony regarding that. But the initial report blames the incident on the broken spring and the broken glass bottle that was in the bottom. And it's only for purposes of res ipsa loquitur. And the question is, can the plaintiff, and it's the plaintiff's burden, eliminate the more probable causes? Because that's the only way they get it. They're getting a presumption of negligence. So in order to apply this rare occasion, the plaintiff has to prove that all those other possible causes are eliminated. The only times that it's applied is when the only possible cause, it's not possible, more probable, the only probable cause... If they're giving us all this inconsistent testimony, wouldn't that be for a jury or a finder of fact to sort out, not for us to do on summary judgment? Well, I raised it because it was raised in the appeal. Rockton did not file a summary judgment on the issue of res ipsa loquitur trying to apply it. The plaintiffs did. On theirs, it was denied. And I presume they're raising it at this stage for trying to argue that res ipsa loquitur should apply. And so it's their burden to show that res ipsa loquitur applies in the situation, even if it's appropriately before the court. But it was briefed, and there's no doubt it was all contained in all the briefs. But for a variety of reasons, res ipsa loquitur should not be applied to this case. It's simply not a scenario where the plaintiffs are entitled to a presumption of negligence and an end around the requirements of knowledge and constructive notice contained in 2317.1. Just briefly to address some of the cases, and I'm going to jump back to 2317.1, but briefly to address a couple of the cases mentioned by the appellant. First is the Matthews case that was talked about as to why there's a duty to inspect in all scenarios. Well, I believe that case is distinguishable for a couple reasons as well. In Matthews, the back of a casino stool broke, and they only found one of the three screws that were attached to it. They couldn't find the other two. And it was concluded that when there was a recent upholstering job, they didn't replace all the screws. They just had one left. But the court, relying upon the warnings label on the chair, the warnings label said, this product must be inspected annually, and specific attention should be given to the tightness of the bolts. The court said, once you have a non-structural repair like the upholstery, you have to follow the warning label on this chair, and you should have done an inspection. It's not merely just because an accident occurred that an inspection was needed to be done. And in that situation, the evidence clearly reflected that an inspection would have discovered the lack of two screws, and discovering the lack of two screws would have prevented the accident. As it relates to the Robert case, which was briefed, and that was the Robert V. Turner Specialties case, which was another Rock 10 case, where in that particular incident, it was an offloading incident as well. But in that particular incident, there was a problem offloading. So the driver stopped and asked Rock 10 to check its equipment. Rock 10 checked his equipment and said, you're good. And he started offloading again, and the line ruptured. Well, what they later determined was that, while Rock 10 said they inspected their equipment, they didn't in that instance because the valve was partially closed. And because the valve was partially closed, it created restriction. But that is why the court found that there was a duty to inspect. It was because he was asked to inspect, and an inspection would have found that the valve was closed. And that was the evidence before them, which is not the evidence in this case.  Thank you, Your Honors. I would first note, I don't think there's any dispute that his expert said, more probably than not. We all know more probable means more than 50%, and that's what he said. Didn't that get excluded because it was too late? Y'all moved to amend, and the magistrate said no? How's that part of the record at this point? Well, it's part of the record because it was submitted as part of the motion. The judge didn't consider it in deciding the motion for summary judgment. I briefed this fully, but clearly under the standards set forth by this court, the district court abused its discretion. But then he considered it on the motion for reconsideration and didn't think it mattered. Well, you're right. He said, well, because there's no actual notice. That's what he said. He said it might be noticed to the second guy because the first accident happened, but you haven't produced any evidence that they should have known about the first clock. And respectfully, that issue goes a lot to the Ray Sipsa argument, and he really didn't address, he didn't talk about that in that ruling. He said, well, it doesn't matter because I've ruled there wasn't any actual notice. And so he gave it a one line, you know, well, I've already ruled there's no actual notice, so it doesn't matter that I didn't consider it. Your Honor, and I would note, and it's pointed out by Judge Haynes, it would be one thing in this case if the argument were about the frequency of the inspections or the frequency of the maintenance, and they did it every two years, and we said they should have done it every three months. They never did it, and they had no plans to. They had no procedures to. They never looked at this. They never did. They never touched it. And the bleeder line that was clogged was not accessible to the truck driver. It's a valve that goes off under a grate underground, and all the talk about the gauge on the truck is meaningless in this case because if you have a gauge on your truck, it measures the pressure inside the tanker. And before you use the bleeder line, you turn off the valve to the tanker, and you turn off the valve to the facility. So the only pressure gauge that would read anything would be one attached to the bleeder line. Theoretically, there wasn't one. But whether or not the pressure gauge on the tanker worked or not could not, as a matter of fact and common sense, have anything to do with this because the tanker, the pressure gauge on the tanker measures the pressure inside the tanker, and that is closed before the bleeder valve is open. Can somebody testify that it's standard practice to have these gauges on this line or that? Yes, Hoffman. And that's the industry standard? Yes, yes. He says that in his Rule 26 report, which is... And would that gauge have prevented this problem? Yes, because you could have looked at the gauge and seen if I open this, when I pull this hose off my tanker, it's still going to have acid in it. And, Your Honor, if... It's clear, had they exercised reasonable care, we wouldn't be here. Now, they did, contrary to the statements during the appellee's argument, they did move for summary judgment on race. It was, again, sort of a throwaway argument because their motion for summary judgment focused on causation and it focused on things like there was a broken bottle in the tanker, and they focused on that report, which was repudiated by all the authors. And everybody agreed by the time we got to the summary judgment motion, hey, you know, the cause of this was the clog line. Now, at the time they filed the motion, I still think the people had repeated that report, but their expert hadn't said, well, I agree, it was a clog line. But that was the fight in this motion, Your Honor, was causation. They filed a motion for summary on causation. They had a couple of throwaways at the end there. And clearly, they couldn't get summary judgment on causation. But the big fight was on causation. That's what they briefed. The rest of this was a throw-in argument. They didn't get into reasonable care. You know, as practicing lawyers, we try to do the best we can to cover all our bases and anticipate every argument. But when reasonable care or lack thereof is not raised by them or pointed out to us, there is evidence in the record that supports they didn't exercise reasonable care, luckily. And I would point to the court, they don't even dispute that in their brief. They never argued we exercise reasonable care. Not one time. And so to say, well, you know, where is, you didn't brief this fully, this issue. This issue was never raised to us. It wasn't. And it's crucial to the motion. For them to get summary judgment, they have to beat that part of the statute. They beat the first part. No actual notice. But for them to get summary judgment on the second part, they either have to put on evidence that we can't win. I'm sorry, I'm out of time. Thank you very much.